USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/08/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE COLGATE-PALMOLIVE CO.
ERISA LITIGATION

THIS DOCUMENT RELATES TO:
ALL ACTIONS

Master File No. 07-cv-9515

ORDER & OPINION

---

LORNA G. SCHOFIELD, United States District Judge:

On October 9, 2013, Plaintiffs moved for preliminary approval of a $45.9 million class action settlement. The Court granted preliminary approval on December 16, 2013, and notice of the settlement and a fairness hearing was sent to class members. On April 4, 2014, the Court held a fairness hearing. No objections to the settlement were filed, and no objectors appeared at the hearing. By separate order, the Court approved the settlement as fair and adequate under Federal Rule of Civil Procedure 23(e).

Plaintiffs move for fees and costs to be paid out of the settlement fund pursuant to Federal Rule of Civil Procedure 23(h). The requested attorneys' fee is 25% of the fund or $11,475,000. Plaintiffs also move for costs of $591,011.17 and fee awards of $5,000 for each of the Plaintiffs for their participation in the litigation. The motion is granted.

## BACKGROUND

This ERISA case began in 2007 as three separate suits, filed in three jurisdictions, alleging that Defendant Colgate-Palmolive Company Employees' Retirement Income Plan, sponsored by Colgate-Palmolive Company miscalculated the pension benefits of several thousand participants from July 1, 1989 to the present. The case did not follow any similar government investigation or settlement relating to the Plan. The subject matter of this action is complex and requires a command of ERISA, the Internal Revenue Code, and related regulations

and regulatory guidance.  Class Counsel are Kessler, Topaz, Meltzer & Check, LLP; Korein Tillery, LLC; Gottesdiener Law Firm, PLLC; and Edgar Pauk, Esq.  They are all experienced at litigating ERISA class actions.  Class Counsel represent that "only a handful of ERISA lawyers around the country [are] prosecuting actions like the instant case as most large class-action firms and ERISA lawyers shun them because they lack the requisite expertise."

The case was litigated for more than three years, and then the settlement was negotiated for another three years.  I received the case on reassignment and presided over settlement negotiations for approximately the last year.  Class Counsel's work on the litigation included investigating and filing the Complaint, conducting targeted document discovery, working with outside actuarial experts, and briefing a motion to dismiss.  The settlement negotiations included three mediations conducted in 2010, for which counsel prepared detailed mediation statements, as well as extensive involvement by and consultation with the parties' actuarial experts since then to finalize the settlement.  Ultimately, certain claims known as the Residual Annuity Claims were excluded from the scope of the settlement.

Under the Settlement, the Plan will pay approximately $45.9 million in additional gross settlement benefits to 8,612 current and former Plan participants (or beneficiaries) – an average of $5,330 per person.  Class Counsel worked a total of 3,915 billable hours on this matter.  This represents work performed up to March 9, 2014, and excludes time spent preparing and arguing the motion to approve the settlement and attorneys' fees, and time that will be spent administering the settlement.  If attorneys' fees were calculated on an hourly basis at current rates, the total fee or "lodestar" would be $2,200,927.  A fee award of 25% of the fund or $11,475,000 would represent a multiplier of 5.2 of the lodestar.

**LEGAL STANDARD**

In Rule 23 class actions, the "attorneys whose efforts created the fund are entitled to a reasonable fee -- set by the court -- to be taken from the fund." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). "What constitutes a reasonable fee is properly committed to the sound discretion of the district court . . . and will not be overturned absent an abuse of discretion . . . ." *Id.* The reasonableness of a fee in this Circuit is evaluated considering the *Goldberger* factors: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger v. Integrated Res., Inc.*, 209 F.3d at 50 (omission in original).

District courts in this Circuit may use one of two methods as a starting point to analyze attorneys' fees. *Goldberger*, 209 F.3d at 50. One method is the "lodestar" method, by which the district court multiplies the reasonable hours billed by a reasonable hourly rate. *See id.* at 47. Once that computation is made, the district court may adjust the multiplier based on other factors such as the risk of the litigation or the performance of the attorneys. *See id*. The second method is the "percentage of the fund" method, which is the trend in this Circuit. *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*, 396 F.3d 96, 121 (2d Cir. 2005). Under the percentage method, the fee is a reasonable percentage of the total value of the settlement fund created for the class. *See Goldberger*, 209 F.3d at 47. The percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc.*, 396 F.3d at 121. In contrast, the lodestar method creates "a disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of the line-item fee audits." *Id.* at 121 (internal

quotation marks, citations and alterations omitted).  The percentage method is used to evaluate the attorneys' fees in this case.

## **DISCUSSION**

### I.  Attorneys' Fees

A three-step approach to considering the *Goldberger* factors follows below.  The first step is to determine a baseline reasonable fee with reference to other common fund settlements of a similar size and complexity, based on the subject matter of the claims.  This analysis considers three of the *Goldberger* factors – the requested fee in relation to the settlement, the magnitude and complexity of the case, and the policy consideration of using a sliding scale to avoid a windfall to class counsel.  The second step is to consider the *Goldberger* factors of risk, the quality of the representation and other public policy concerns to make any necessary adjustments to the baseline fee.  The final step is to apply the lodestar method as a cross-check, which addresses the final *Goldberger* factor of the time and labor expended by counsel.  Based on this analysis, a reasonable baseline fee in this case is 25%, which requires no further adjustment.

#### A.  Comparison to Court-Approved Fees in Other Common Fund Settlements

In using the percentage of the fund approach, the critical *Goldberger* factor is necessarily the requested fee in relation to the settlement.  The fee must be reasonable, *Goldberger*, 209 F.3d at 47, but measured against what?  As District Judge Gleeson of the Eastern District of New York stated, "[e]ven with the aid of the Goldberger factors, I have struggled to find a strong normative basis by which to evaluate the requested fee or to generate" my own percentage of the fund.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 05 MD 1720, 2014 WL 92465, at *3 (E.D.N.Y. Jan. 10, 2014).  Even considering the circumstances of a particular

case, without some external reference, there is no reason that a 20% fee award is more or less reasonable than a 30% fee award.

The Second Circuit has cautioned that any fixed percentage for all cases as the ultimate fee or even a starting point for the analysis "seems to offer an all too tempting substitute for the searching assessment that should properly be performed in each case." *Goldberger*, 209 F.3d at 52.  Instead, a "sliding scale" approach -- awarding a smaller percentage for fees as the size of the settlement fund increases -- is appropriate and avoids a windfall to plaintiffs' counsel to the detriment of class members.  *Wal-Mart* at 122-23 ("Recognizing that economies of scale could cause windfalls in common fund cases, courts have traditionally awarded fees for common fund cases in the lower range of what is reasonable.").  The difficulty of bringing a case is not linearly linked to the potential size of the fund, as it is not "ten times as difficult to prepare, and try or settle a 10 million dollar case as it is to try a 1 million dollar case."  *Goldberger*, 209 F.3d at 52.

In order to "avoid routine windfalls where the recovered fund runs into the multi-millions, . . . courts typically decrease the percentage of the fee as the size of the fund increases." *In re Interpublic Sec. Litig.*, 02 Civ. 6527, 2004 WL 2397190, at *11 (S.D.N.Y. Oct 26, 2004) (internal citations and quotation marks omitted).  Empirical evidence supports this observation and shows the "overwhelming determinant of fee is the amount of the recovery for the class." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: An Empirical Study,* 1 J. Empirical Legal Stud. 27, 58 (2004); *accord* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993 – 2008*, 7 J. Empirical Legal Stud. 248, 263-64 (2010) ("Eisenberg & Miller"); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J.

Empirical Legal Stud. 811, 837-839 (2010) ("Fitzpatrick") ("fee percentage is strongly and inversely associated with settlement size among all cases").

As some courts have noted, when applying the sliding scale, it is important to ensure that the fee awarded decreases in such a way that some percentage of each extra dollar gained for the class goes to the attorneys. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2014 WL 92465, at *7 ("A graduated schedule ensures that the greater the settlement, the greater the fee, and it therefore avoids certain incentive problems that come from simply scaling an overall percentage down as the size of the fund increases."). Attorneys should not fear that, at any point, by securing a larger award for the class, they will receive a smaller award. *See id.* at *7; *see also In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001).

To apply a sliding scale requires a starting point. In the context of a class action settlement, it is unlikely that any private stakeholder is a reliable source of information. Plaintiffs' counsel have every incentive to request high fees. Individual plaintiffs rarely have any incentive to object to a fee, while defendants do not care about the allocation of the settlement fund among the class members and their attorneys. *See McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 418 (2d Cir. 2010) (discussing the incentives of plaintiffs and defendants); *In re Auction Houses Antitrust Litig.*, 197 F.R.D. at 71, 77-78 (S.D.N.Y. 2000) (discussing the collective action problem faced by dispersed class members).

Historical data of fees awarded in common fund cases provides an unbiased and useful reference for comparing fees cases of similar magnitude as a starting point for the sliding scale. Professors Eisenberg and Miller's 2010 empirical study examined data from nearly 700 common fund settlements between 1993 and 2008. Eisenberg & Miller, *supra* at 251. Eisenberg & Miller divided cases into ten ranges of recovery (deciles) based on the amount of the settlement, and

then calculated the mean and median fee percent, as well as the standard deviation. *Id*. at 265. The value of the settlement here is $45.9 million, which puts this case in the eighth decile of cases with settlements between $38.3 million and $69.6 million. *Id*. at Table 7.[1] In that decile, the median fee was 21.9% of the fund with a standard deviation of 10%. *Id.* Professor Fitzpatrick similarly reviewed almost 700 class settlements, but limited to two years, 2006 and 2007. Fitzpatrick, *supra* at 811. He found that in the ninth decile of his cases, comprising settlements between $30 million and $72.5 million, the median fee percentage was 24.9% with a standard deviation of 8.4%.[2] Fitzpatrick, *supra* at 839, Table 10.

---

[1] Table 7: Mean, Median, and Standard Deviation of Fee Percent, Controlling for Class Recovery Amount, 1993–2008

| Range of Class Recovery (Millions) | Mean | Median | SD | N |
|---|---|---|---|---|
| Recovery <= 1.1 | 37.9 | 32.3 | 19.6 | 69 |
| Recovery >1.1 <= 2.8 | 27.1 | 26.4 | 9.1 | 69 |
| Recovery >2.8 <= 5.3 | 26.4 | 25.0 | 9.8 | 69 |
| Recovery >5.3 <= 8.7 | 22.8 | 22.1 | 8.4 | 69 |
| Recovery >8.7 <= 14.3 | 23.8 | 25.0 | 8.1 | 69 |
| Recovery >14.3 <= 22.8 | 22.7 | 23.5 | 7.5 | 69 |
| Recovery >22.8 <= 38.3 | 22.1 | 24.9 | 8.7 | 68 |
| Recovery >38.3 <= 69.6 | 20.5 | 21.9 | 10.0 | 70 |
| Recovery >69.6 <= 175.5 | 19.4 | 19.9 | 8.4 | 69 |
| Recovery >175.5 | 12.0 | 10.2 | 7.9 | 68 |

Eisenberg & Miller, *supra* at 265 (Sources: Westlaw, LexisNexis, PACER).

[2] Table 10: Mean, Median, and Standard Deviation of Fee Awards by Settlement Size in 2006-2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| Settlement Size (in Millions) | Mean | Median | SD | N |
|---|---|---|---|---|
| $0 to $0.75 | 28.8 | 29.6 | 6.1 | 45 |
| $0.75 to $1.75 | 28.7 | 30.0 | 6.2 | 44 |
| $1.75 to $2.85 | 26.5 | 29.3 | 7.9 | 45 |
| $2.85 to $4.45 | 26.0 | 27.5 | 6.3 | 45 |
| $4.45 to $7.0 | 27.4 | 29.7 | 5.1 | 44 |
| $7.0 to $10.0 | 26.4 | 28.0 | 6.6 | 43 |
| $10.0 to $15.2 | 24.8 | 25.0 | 6.4 | 45 |
| $15.2 to $30.0 | 24.4 | 25.0 | 7.5 | 46 |
| $30.0 to $72.5 | 22.3 | 24.9 | 8.4 | 42 |
| $72.5 to $6,600 | 18.4 | 19.0 | 7.9 | 45 |

Fitzpatrick, *supra* at 839, Table 10 (Sources: Westlaw, PACER, district court clerks' offices).

These fees, which apply to all types of cases, perhaps understate the appropriate percentage for fees in ERISA cases. ERISA concerns a highly specialized area of law. *See Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 350 (7th Cir. 2012) ("Federal pension law is a highly specialized field that judges encounter only intermittently.") (Posner, J.). Class Counsel asserts that relatively few lawyers have the expertise to litigate the types of claims in this case. These considerations suggest that a higher fee is warranted in ERISA cases as compared with some other types of cases.

The two empirical studies discussed above also examined common fund cases by subject matter. The median recovery in ERISA cases is somewhat higher than in the cases reviewed as a whole. Eisenberg & Miller found that the median for ERISA cases was a fee of 25% of the settlement fund in a review of 43 cases between 1993 and 2008, which was slightly higher than the median of 24% for all 688 cases examined. Eisenberg & Miller 2010, *supra* at 262, Table 5. Fitzpatrick, in a similar analysis, found the median fee in employee benefit (ERISA) cases was 28% of the fund in a review of 37 cases in 2006 and 2007, which again was somewhat higher than the median of 25.7 out of 444 cases sampled. Fitzpatrick, *supra* at 835, Table 8; *see also* Fitzpatrick, *supra* at 818, Note to Table 1 (explaining that employee benefits cases are ERISA cases). Fitzpatrick's results are consistent with almost 100 ERISA settlements between 1997 and 2013 reported by Class Counsel here at the Court's request, for which the median fee percentage was 28% of the fund with a standard deviation of 5%.

The academic studies do not discuss whether the higher fee percentage in ERISA cases is statistically significant or why the fee awards in ERISA cases tend to be higher as a percentage of the settlement fund than in other cases. In any event, the data specific to ERISA cases reflects

any considerations unique to these types of cases, such as complexity of the subject matter or the expertise of ERISA class counsel.

Mindful that the Court acts as a fiduciary that must "serve as a guardian of the rights of absent class members," *Goldberger*, 209 F.3d at 52, a reasonable baseline fee for an ERISA case of this size is 25%, based on the empirical studies, which reflect a median fee of 25% to 28% in ERISA cases of comparable size.

### B. Consideration of Risk, Result and Policy Considerations

The next step of the analysis is to consider three additional *Goldberger* factors – the risk of the litigation, the quality of the representation and any remaining policy considerations. If this case were demonstrably exceptional in any of these areas, then an increase or decrease of the baseline percentage would be warranted. However, nothing in the record is persuasive that this case is exceptional in these three respects.

#### 1. The Risk of Litigation

Risk should be considered "as of when the case is filed." *Goldberger*, 209 F.3d at 55. Assuming significant risks warrants a substantial fee because "[n]o one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974), *abrogated by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).

Here, the law was unsettled on several issues relating to liability and/or damages. For example, a serious statute of limitations defense, if successful, would have barred the claims of all but one of the six Plaintiffs and 80% of the Lump Sum Class Members. The number of class members, and consequently any recovery, could have been significantly narrowed on this

ground. Regarding the Backloading Class, the law changed during the course of the litigation, making the law certain but fixing and limiting Plaintiff's potential recovery. This change thus actualized a risk that Plaintiff assumed at the outset of the litigation.

On the other hand, very little discovery had taken place in this case before mediation commenced. The Defendants withdrew their motion to dismiss as the parties began to engage in mediation. Proceedings were protracted, but Class Counsel did not take on the high risk that they would work a large number of hours only to see little or no recovery.

That this case involved some risk is not a reason to increase the baseline percentage as it is assumed, in the absence of information otherwise, that large ERISA class actions typically will involve risk. An exception would exist if the case followed a government investigation that provided the theories of the case, a collection of relevant discovery, or even a defendant's admission of liability. *See In re Citigroup Inc. Secs. Litig.*, 965 F. Supp. 2d 369, 399 (S.D.N.Y. 2013) ("[T]he factors that traditionally render securities cases most likely to survive a motion to dismiss and, in turn, to settle – such as prior government investigations – are absent here."). No such investigation preceded this litigation. Consequently, the risk level in this case does not mandate either an increase or a decrease in the baseline percentage.

      2. The Quality of Representation

Class Counsel in this case belong to what they credibly maintain is a small and select group of experienced class counsel who have litigated numerous ERISA pension benefit class actions. When awarding attorneys' fees, the "ideal proxy" for the award should reflect the fees upon which common fund plaintiffs negotiating in an efficient market for legal services would agree. *Goldberger*, 209 F.3d at 52. A corollary of this principle is that as a case requires more expertise -- and, consequently, as fewer lawyers could competently bring the case -- a larger

percentage of the fund should be awarded to those lawyers.

Nevertheless, "the quality of representation is best measured by results." *Goldberger*, 209 F.3d at 55. The Settlement is the product of three years of negotiations and consultations with actuarial experts and appears to be a fair reflection of the strength of each constituency's case. The Lump Sum Class Members who are not vulnerable to a statute of limitations defense will receive approximately 40% of the maximum that they could have received, which includes prejudgment interest, and assumes that they would have prevailed on all of the disputed legal issues, including class certification. The Lump Sum Class Members who are subject to a statute of limitations defense will recover approximately 10% of the maximum potential settlement, and account for 85% of the total settlement amount. The Backloading Class members will receive nearly 100% recovery based on the change in the law that occurred during the litigation. Also significant is that Class Counsel preserved and did not compromise a group of claims arising under the "Residual Annuity Amendment."

The settlement appears to be a fair reflection of the risk-adjusted value of the claims. Without the benefit of an adversarial examination of the issues, there is no reason on the submissions before the Court to conclude that the result is so exceptional as to warrant an increase in the baseline percentage.

### 3. Public Policy Considerations

Protecting workers' retirement funds is of genuine public interest. Public policy relies on private sector enforcement of the pension laws as a necessary adjunct to Department of Labor intervention. Counsel's fees should reflect the important public policy goal of "providing lawyers with sufficient incentive to bring common fund cases that serve the public interest." *Id.* at 51. While court awarded fees must be reasonable, setting fees too low or randomly will create

poor incentives to bringing large class action cases. *See In re Veeco Instruments Inc. Sec. Litig.*, 05 MDL 01695, 2007 WL 4115808, at *3, *8 (S.D.N.Y. Nov. 7, 2007) (citing *Goldberger*, 209 F.3d at 51 (noting the "commendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest")). Courts must scrutinize the unique circumstances of each case with "a jealous regard to the rights of those who are interested in the fund," but also provide incentives to bring these cases in the future. *Goldberger*, 209 F.3d at 53.

This factor too warrants no adjustment to the baseline percentage. Other types of common fund cases are based on laws reflecting important policy concerns -- for example, the protection of consumers or investors. No particular public policy concern differentiates this case, and so no adjustment is needed.

### C. The Lodestar Cross-Check

The last *Goldberger* factor to consider is the time and labor expended by counsel, which is essentially what the lodestar method does by assessing the value of attorney hours worked times a reasonable billing rate. The lodestar cross-check works best as a sanity check to ensure that an otherwise reasonable percentage fee would not lead to a windfall. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005) ("The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award."). If the lodestar were grossly disproportionate to the percentage fee award being considered, the Court would adjust downward from its baseline. *See id.* On the other hand, the lodestar method has fallen out of favor particularly because it encourages bill-padding and discourages early settlements. *See Goldberger*, 209 F.3d at 50 (critiquing the lodestar).

The requested lodestar multiplier in this case was five, which is on the high end.  *See* Eisenberg & Miller, *supra* at 272, Table 14 (finding that the median multiplier is around two); *but see* Fitzpatrick, *supra* at 834 n.80 (suggesting that cases identifying multipliers are self-selected to report low multipliers).  In the 96 ERISA cases submitted by Plaintiffs in support of this motion, only 53 reported a multiplier.  In those cases, the implied multiplier ranged from less than one to eight times the lodestar, and nine cases had multipliers greater than four.  The median multiplier was 2.1 with a standard deviation of 1.6.  In this context, the multiplier in this case was large, but not unreasonable.

### D. Appropriate Fee Award

Class Counsel have requested a fee of 25% of the settlement fund.  Although any proffered number will have a psychological anchoring effect, counsel's self-interested proposal should not be the analytical starting point to determine the fee award.  In other words, the process should not be for class counsel to propose a dollar amount, and then for the court to pronounce it reasonable or not, and if the latter, chip away at the number based on the *Goldberger* factors.

A 25% fee in this case is reasonable, as it is comparable to other ERISA class actions of a similar magnitude as shown by empirical research.   Nothing in the record about the particular circumstances of the case, as compared with other common fund cases, warrants an increase or decrease to this percentage.  The settlement takes into account the competing interests of protecting the rights of absent class members and providing incentives for further litigation.

## II.  Costs

Plaintiffs move the Court for reimbursement of $591,011.17 in expenses, which were advanced or incurred collectively while prosecuting the case.  The lion's share of these expenses

was for experts (approximately $490,000) and mediation (approximately $25,000), both critically important to this litigation. Courts routinely award such costs. *See In re Merrill Lynch & Co.*, *Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 178 (S.D.N.Y. 2007) ("Counsel is entitled to reimbursement from the common fund for reasonable litigation expenses."); Fed. R. Civ. P. 23(h). Counsel's motion for costs is accordingly granted.

### III. Named Plaintiff Incentive Awards

An incentive award may be given to compensate named plaintiffs for efforts expended "for the benefit of the lawsuit." *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 124 (S.D.N.Y. 2001). Plaintiffs request an incentive award of $5,000 each, or a total of $30,000, to compensate them for their efforts and personal time spent advancing the litigation on behalf of the Class. Plaintiffs reviewed draft pleadings and motions, searched for and produced relevant documents, reviewed filings, and communicated regularly with Class Counsel.

The requested amount is in line with those awarded in similar complex class actions. *See*, *e.g.*, *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chas Bank, N.A.*, 09 Civ. 686, 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (awarding $50,000 to each of the three named class representatives); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 151 (awarding case contribution awards in the amount of $15,000 to each of the three named plaintiffs); *Strougo v. Bassini*, 258 F. Supp. 2d 254, 264 (S.D.N.Y. 2003) (collecting cases and granting an award of $15,000 to class representative).

The six Plaintiffs are awarded a payment of $5,000 each to compensate them for their efforts in the litigation.

**CONCLUSION**

Class Counsel is hereby awarded attorneys' fees of $11,475,000.00 and reimbursement of expenses in the sum of $591,011.17 to be paid from the Funds. Each of the six Plaintiffs is awarded $5,000 from the Funds.

Dated:  July 8, 2013
         New York, New York

*(signature)*
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**